## Nockamixon Township Landfill Operation

*Robert W. Valimont* and *Peter A. Glascott,* for appellant.

*Douglas R. Blazey,* for Commonwealth.

MALIN, Chairman, March 21, 1972.—This is an appeal by Nockamixon Township from the grant to the County of Bucks of Solid Waste Permit No. 100678 under the Pennsylvania Solid Waste Management Act of July 31, 1968 (No. 241), 35 PS §6001, for the operation of Hidden Valley Landfill in Nockamixon Township. Originally, appellant also appealed from the grant of Industrial Waste Permit No. 0971204 under the Clean Streams Law, but this part of the appeal was withdrawn at the hearing held in this matter.

The township argues that the permit should not be issued for operation of the landfill until such time as a leachate collection and treatment system is installed and operating. It also argues that the collection system approved in permit no. 100678 is inadequate because part of the system is a contingency plan, to be constructed only if the original part of the system fails to collect all of the leachate emanating from the landfill.

## FINDINGS OF FACT

1. Bucks County is the owner and operator of

Hidden Valley Landfill, located in Nockamixon Township.

2. In December, 1970, the township initiated an action in equity in the Court of Common Pleas of Bucks County, Pa., December term, 1970, no. 1252, to enjoin the operation of Hidden Valley Landfill by the county.

3. At that time, the county did not have a permit for operation of the landfill, nor had an application for a permit been filed.

4. On February 27, 1971, the Court of Common Pleas of Bucks County entered judgment against the county based upon admissions contained in the pleadings in that action and the landfill was closed.

5. On May 28, 1971, the county applied for a Solid Waste Disposal Permit and on June 4, 1971, was granted permit no. 100678. That permit has not been revoked and continues in effect.

6. The permit covered operation of solid waste disposal sites designated as A and B on the plan submitted as part of the application. Site A contained the site which was then being operated as a landfill, and site B was a new area to be filled after the completion of operations at site A.

7. The permit required the county to apply for and obtain an Industrial Waste Permit for the construction and operation of a treatment facility by July 2, 1971.

8. The county filed an application for a Water Quality Management Permit on July 7, 1971, and an amendment thereto dated August 3, 1971. Permit No. 0971204 was issued on August 17, 1971.

9. Reports filed by members of the Pennsylvania Department of Environmental Resources, based upon visits to the site, indicated that the site was not an appropriate one for a landfill unless a collection and treatment system was provided.

10. Application no. 100678 provided for a collection system based upon trenches which will surround the landfill area and collect liquids which flow horizontally.

11. Stephen F. Curran, Jr., geologist in the Division of Water Quality, Bureau of Sanitary Engineering, Department of Environmental Resources, suspected that vertical fracturing in the rock structure underlying the landfill area might permit liquid effluent to flow vertically downward, thus escaping collection in the surface trenches, and then moving with ground water into the surrounding streams.

12. Valley Forge Laboratories, Inc., consulting engineering firm engaged by the county, conducted additional tests and submitted data to Mr. Curran which indicated that there was no substantial fracturing of the rock and vertical flow would not occur.

13. Although the data indicated that there would be no vertical flow and Mr. Curran's fears of such flow were based upon visual observation rather than technical data, the department required the county to amend its application by adding provisions for a contingency collection system, to be constructed and operated in the event the original system did not capture all of the leachate eminating from the landfill.

14. Construction of the contingency system would require additional land acquisitions and, in addition to the cost of the acquired land, the expenditure of $20,000 to $100,000 on work and equipment.

15. The existing landfill is producing leachate, a highly concentrated pollutant, which is flowing into the waters of the Commonwealth and there are no facilities presently existing which can collect and treat that effluent.

16. Operation of the landfill at the present site and at any additional sites will continue to produce

leachate, for which no collection and treatment facilities presently exist.

17. Application no. 100678 and the data submitted with it support the department's conclusion that the collection and treatment system as designed will, when constructed, be adequate to handle the effluent generated by the landfill.

18. Provision for additional collection and treatment facilities as a contingency, rather than as part of the original system, is a reasonable conclusion by the department in light of the available data and the high cost involved in providing for the contingency.

## DISCUSSION

We cannot agree with the township's argument that the contingency collection system must be made part of the original system. No data submitted in connection with this matter supports a conclusion of vertical fracturing within the site that would lead to discharges which will escape the original collection system. While observations of discharge at or near stream level give cause for concern, all the results of test data submitted to the department indicate that there is no vertical fracturing within the site. The permit provides for an observation period of approximately two months after construction of the original system, followed by construction of an additional collection system within another two months in the event that a pollutional effluent escapes the original system. A contingency plan to guard against such discharge, which might never occur, is not an unreasonable conclusion by the department, since considerable amount of trouble and expense would be involved.

A more serious question arises with respect to the grant of the Solid Waste Management Permit prior to construction of the original collection system. The

parties agree that a pollutional discharge is emanating from the landfill and that there are no facilities presently available to collect and treat this effluent. Construction of the collection and treatment facilities, if the original schedule were adhered to, would not be completed and in operation until May 1, 1972, or June 1, 1972. It is likely that the litigation surrounding this project will extend those dates by many months. Therefore, the question is whether it was proper for the department to grant a permit with respect to a landfill which was producing a pollutional discharge for which treatment facilities were not available at the time the permit issued.

Section 7 of the Pennsylvania Solid Waste Management Act makes it unlawful to operate a solid waste disposal area without a permit from the department.

Section 9(4) of the act makes it unlawful to store, collect, transport, process or dispose of solid wastes contrary to the rules, regulations, standards or orders of the department or in such a manner as to create a public nuisance.

While no language of the act specifies the criteria to be used by the department in passing on an application for a permit, it appears clear from section 9(4) and from other sections of the act that the department may not grant a permit for conduct which is in violation of the act or of department rules and regulations. This is confirmed by section 75.41 of the regulations of the Department of Environmental Resources, which provides that planning, design and operation of any solid waste disposal facility shall be in accordance with the standards of the department. Section 75.42 (a) of the regulations provides: "All areas of solid waste management systems, including all processing and disposal facilities, shall be operated in such a

manner as to prevent health hazards and environmental pollution."

Since it is agreed by all parties that the Hidden Valley Landfill is producing an untreated effluent which is causing environmental pollution, operation of the landfill is in violation of regulation section 75.42(a), is, therefore, in violation of section 75.41(a), and is unlawful conduct under section 9(4) of the Pennsylvania Solid Waste Management Act. Furthermore, such a discharge constitutes a nuisance under section 3 of the Clean Streams Law of June 22, 1937, P. L. 1987, 35 PS §691.3, as amended. The existence of this nuisance is established as a matter of law by the order of the Court of Common Pleas of Bucks County of February 26, 1971. Since the operation of the landfill constitutes a nuisance, this also puts it in violation of section 9(4) of the Pennsylvania Solid Waste Management Act.

Because the Solid Waste Management Act is a new statute and many landfills were in operation prior to the time that its provisions became effective, the department has adopted a policy of seeking compliance with the act over a reasonable period of time rather than forcing the closing of every existing landfill in the State which does not meet the requirements of the act and the regulations adopted pursuant to it. Therefore, if this present case involved only the question of lack of enforcement of the precise terms of the act by the department, we might hold that the department is acting within the bounds of a reasonable exercise of discretion. However, this is a different situation. Rather than merely the lack of enforcement by the department, we have here a situation in which the department has issued a permit to a landfill which is generating pollution, is not treating that

pollution, and, therefore, is in violation of the Clean Streams Law and doctrines of public nuisance. To clothe such conduct with legality by issuing a permit is incorrect. The grant of a permit should indicate that the department has determined an existing operation or a proposed operation will meet all applicable provisions of law at the time that the permit becomes effective for the conduct sanctioned by the permit. The department, in permit no. 100678, has conditioned the filling of a new site, Area B, upon completion and operation of the collection and treatment system. If the same were true of the existing landfill site, Area A, issuance of the permit would not be unlawful because it would apply only when the operation meets all of the applicable provisions of the statute and the regulations.

In its brief, the department argues that fill created pursuant to the permit may be considered as a landfill separate and apart from those layers of refuse already on the site before the permit was granted. Such a fiction cannot be justified. Site A is all one landfill, some layers of which have been filled in the past and some of which will be filled in the future. Surface water filtering through the refuse will pass from one layer to another without distinction based on whether that layer was created before or after the permit was granted. The effluent which emerges will be just as toxic and just as harmful to everything it touches, whether formed with or without a solid waste permit. Operation of this site as an entity is producing pollution and the activity cannot be broken into fictional parts.

The county solicitor made a statement at the hearing to the effect that it takes from 18 to 36 months for surface water to sink through the refuse layers and emerge at the bottom as leachate, that the county did

not own the landfill at the time that the liquid presently emerging began its journey from the surface, and that liquid which began the process when the county acquired the landfill will not emerge for many months. From this the department argues in its brief that protestants failed to show the applicant is causing pollution.

There are two responses to this argument. First, the solicitor's statements are not supported by any evidence in the record, and they were not agreed to by the parties so as to become stipulated facts. Second, even if the facts were accepted as stated, they do not lead to the suggested conclusion. This is another attempt to create a fictional fractionalization of a unified and continuous process. If the department's argument prevailed, the provisions of the Solid Waste Management Act could be avoided merely by transferring ownership of a landfill every 18 months, or within whatever period for leachate generation is determined for a given landfill. Such a result would not be within the intention of the act.

Grant of the permit was erroneous because the grant became effective even in the absence of a collection and treatment system at a time when a pollutional discharge was being generated and was flowing into the waters of the Commonwealth.

## CONCLUSION OF LAW

The grant of a permit to operate Hidden Valley Landfill at a time when a pollutional discharge is emanating from the landfill and no treatment facilities are available is erroneous as being contrary to the terms of the Pennsylvania Solid Waste Management Act.

## ORDER

The appeal of Nockamixon Township is sustained

and Solid Waste Disposal Permit No. 100678 is hereby revoked. Said permit may be reissued only upon the condition that it become operative from and after the time that the collection and treatment system provided for in the application is constructed and operational.